IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
FLASH SEATS, LLC,                    :
                                     :
            Plaintiff,               :
                                     :
    v.                               : Civil Action No. 07-575-JJF
                                     :
PACIOLAN, INC.,                      :
                                     :
            Defendant.               :
                                     :
```

Brian T. Moriarty, Esquire and Colin C. Durham, Esquire of
HAMILTON, BROOK, SMITH & REYNOLDS, P.C., Concord, MA.

John G. Day, Esquire; Tiffany Geyer Lydon, Esquire and Lauren E.
Maguire, Esquire of ASHBY & GEDDES, Wilmington, DE.

Attorneys for Plaintiffs.

Daralyn J. Durie, Esquire; Clement S. Roberts, Esquire and
Benjamin Au, Esquire of KEKER & VAN NEST, LLP, San Francisco, CA.

Jack B. Blumenfeld, Esquire and Julia Heaney, Esquire of MORRIS,
NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.

Attorneys for Defendants.

**MEMORANDUM OPINION**

January 19, 2010
Wilmington, Delaware

Joseph J. Farnan Jr.
**Farnan, District Judge.**

This is a patent infringement case brought by Flash Seats, LLC against Paciolan, Inc. alleging infringement of U.S. Patent No. 6,496,809 ("the '809 patent"), which pertains to a "method of electronically exchanging tickets for an event in a secondary market from ticket sellers to ticket buyers located at remote terminals." '809 patent at 1:59-62. The parties briefed their respective positions on claim construction, and the Court conducted a Markman hearing on the disputed terms. This Memorandum Opinion provides constructions for the disputed terms.

## BACKGROUND

The '809 patent pertains to "a system and method for real-time sales and distribution of tickets." '809 patent at l:6-7. In particular, the invention of the '809 patent is focused on event ticketing that does not utilize paper tickets. Accordingly, the claimed methods and systems involve the association of non-tangible "authentication data" with "paperless tickets" held by a ticket seller. When the seller sells the ticket, ticket transfer is accomplished by reassociating buyer "authentication data" with the ticket. The specification further discloses that tickets may be exchanged in a secondary market through auctions, fixed-price sales, and/or "exchange-type" formats. See id. at 4:2-62. As to the ultimate utilization of the "paperless tickets," the claims all recite that the ticket

holder be granted access to the relevant event without the presentation of any "personalized physical material."

## DISCUSSION

## I.    The Legal Principles Of Claim Construction

Claim construction is a question of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 388-90 (1996).  When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history.  Markman, 52 F.3d at 979.  Of these sources, the specification is "always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term."  Phillips v. AWH Corporation, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"  Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in

2

order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. Phillips, 415 F.3d at 1318-19; Markman, 52 F.3d at 979-80. However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent and its prosecution history. Phillips, 415 F.3d at 1318-19 (discussing "flaws" inherent in extrinsic evidence and noting that extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed. Cir. 1984). If the patent inventor clearly supplies a different meaning, however, then the claim should be interpreted according to the meaning supplied by the inventor. Markman, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. In re Yamamoto, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

## II.   The Meaning of the Disputed Terms

Plaintiff asserts that Defendant infringes claims 1-13 of the '809 patent.  The following is an illustrative independent claim from the '809 patent, with the disputed terms emphasized:

1. A **system** for electronically **exchanging paperless tickets** for an event in a secondary market from ticket sellers to ticket buyers, the system comprising:
   **means for associating the paperless tickets with authentication data of the ticket seller;**
   **means for receiving from ticket sellers electronic asks** comprising an **ask quantity** and an **ask price;**
   **means for receiving from a ticket buyer an electronic bid** comprising a **bid quantity** and a **bid price;**
   **means for comparing the bid to the asks;**
   **means for completing a transfer of the paperless tickets when the bid price equals the ask price and the ask quantity is equal to or greater than the bid quantity;**
   **means for reassociating the paperless tickets** with **authentication data** of the ticket buyer, the **authentication data** of the ticket buyer being provided by the ticket buyer, and wherein the **authentication** data does not constitute a physical material; and
   **means for granting access to the event upon presentation of the buyer authentication data of the paperless ticket** without the buyer presenting any **Personalized physical material**.

Although the parties purport to dispute a large number of claim terms, as explained below, a number of the parties' disputes are redundant.  In general, the parties' disputes may be broken down into three main categories.  First, the parties dispute the nature of the claim term "personalized physical material."  In short, Defendant contends that because the claims

4

require that access to an event be granted <u>without</u> the presentation of "personalized physical material," they do not encompass the use of credit card or driver's license "swipes" as a mechanism for granting event access. Second, the parties dispute the precise ticket exchange formats encompassed by the claims. Defendant contends that the language and structure of the claims exclude both fixed-price sales and auctions from the scope of the claims. Thus, according to Defendant, the claims cover only the use of an "exchange-type" format for the electronic exchange of tickets. Finally, the parties dispute whether the specification sets forth corresponding structure for a number of means-plus-function limitations. Briefly, Defendant contends that under recent Federal Circuit authority, the specification must set forth a particular algorithm for carrying out the functions of a number of means-plus-function limitations, but fails to do so. Rather, according to Defendant, the specification sets forth, at most, a few software and hardware tools that could perhaps be used to implement algorithms for carrying out the functions of the means-plus-function limitations.

For the reasons that follow, the Court construes the disputed terms as follows:

**A. "Personalized Physical Material"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Physical material that was especially created or adapted to allow access to an event, including, for example, a card provided by the seller or event managers or a ticket embodiment such as a paper or cardboard ticket, a physical token, or a smart card containing a physical token. | Physical material bearing or containing information specific to an individual ticket holder. |

The dispute between the parties is whether "personalized physical material" is limited only to items that are "especially created or adapted to allow access to an event" (Plaintiff's position) or not (Defendant's position). In essence, the parties are disputing whether the term "personalized physical material" is broad enough to encompass items such as a credit card or driver's license (Defendant's position) or not (Plaintiff's position). To be clear, the claims require that access to events be granted without the presentation of "personalized physical material." Thus, under Plaintiff's proposed construction, the presentation of credit cards or driver's licenses for admission to an event would fall within the scope of the claims, whereas under Defendant's proposed construction it would not.

In the Court's view, Plaintiff's proposed construction does not comport with the ordinary meaning of "personalized physical material." Indeed, Plaintiff's proposed construction does not in

6

any way embody the concept of "personalization." For instance,
although Plaintiff notes that a dictionary defines the term
"personalized" as "custom tailoring to the individual," (D.I. 60
at 10 (citing Alan Freedman, Computer Desktop Encyclopedia
(Osborne/McGraw-Hill 1981-2008))), the Court simply does not see
such a concept in Plaintiff's proposed construction. Rather,
Plaintiff's proposed construction is instead focused on limiting
"personalized physical material" to information "especially
created or adapted to allow access to an event." In these
circumstances, the Court is highly reluctant to adopt Plaintiff's
proposed construction.

A review of the prosecution history further confirms that
Plaintiff's proposed construction is inappropriate. During
prosecution, the examiner focused on two pieces of prior art:
U.S. Patent No. 6,067,532 issued to Lucas Gebb ("Gebb") and U.S.
Patent No. 5,724,520 issued to Joel R. Goheen ("Goheen"). Both
Gebb and Goheen pertain to ticketing systems. Gebb discloses
that the ticket buyer "can use a ticketless entry into the event,
such as, for example, by an e-token on a smart card." (D.I. 51,
Exh. B at 7:12-13.) Goheen discloses that airline passengers can
access an airplane using "an identification plastic card" that
has a "card number . . . encoded onto a magnetic strip at the
back" and that, if the card is lost, passengers can gain access
to the airplane using identification "such as a driver's license

7

or the like." (Id., Exh. C at 2:50-60, 6:8-10, 8:13-20.) In

light of this art, following an April 2002 interview with the

patentee, the Examiner "indicated that the claims as currently

recited don't indicate that the authentication data is provided

without the use of any man-made tokens or physical material,

however, an added limitation to this effect would appear to be

allowable over the prior art of record." (Id., Exh. I.) In

response, the patentee amended the claims "to clarify that,

according to the present invention, the authentication data does

not constitute a physical material." (Id., Exh. J at 6.) The

Examiner, dissatisfied with the amendment, responded as follows:

> Furthermore, the claims do not currently recite that
> the buyer presents non-physical authentication data to
> gain access to the event. The claims merely recite
> that the paperless tickets are reassociated with
> authentication data of the ticket buyer and that the
> buyer presents this authentication data to gain access
> to the vent. Examiner submits that this language does
> not preclude the use of physical forms of
> authentication data such as an identification card.
> Examiner submits that Gebb discloses wherein the buyer
> possesses a paperless ticket in the form of an
> electronic token (Col. 3, lines 34-42) wherein the
> ticket holder can use a ticketless entry into the vent
> (Col. 7, lines 7-13) and further include authentication
> data such as identification or unique security code
> (Col. 8, lines 63-67).

(Id., Exh. K at 3.) After an additional Examiner Interview to

discuss this issue (see id., Exh. L), the Examiner, with the

patentee's authorization, amended the claims to specifically

state that the ticket buyer is granted access to the event

"without the buyer presenting any personalized physical

material." (Id., Exh. M.)  In his statement for reasons of allowance, the Examiner explained that Gebb, either individually or in combination with other prior art of record, fails to teach that "the buyer is granted access to the event by presenting the authentication data without presenting any personalized physical material." (Id., Exh. M at 6.)

Notably, during prosecution, the Examiner expressed concern that the "specification does not provide support for a system with an access device that accepts authentication data without the use of some form of physical man-made token such as a credit card or bar code." (D.I. 63, Exh. P.)  In a supplemental response to an office action, the patentee asserted that they had identified support in the specification for this particular mode of operation and thus resolved the Examiner's concerns. (D.I. 63, Exh. R at 3.)  Specifically, the patentee wrote that "[a]s Applicant pointed out during the interview, neither the specification nor the claims require presentation of a physical cell phone or credit card. Instead, the Application sets forth examples of non-physical information that can constitute authentication data (i.e., a credit card number or a phone number)." (Id.)  The applicant further stated that "contrary to the Examiner's contention, the present Application provides support for an access device that accepts authentication data without the use of some form of physical man-made token such as a

9

credit card or bar code." (Id. at 4.) In the Court's view, this exchange confirms that both the Examiner and the patentee mutually understood that to make the claims allowable, they would need to be amended to exclude the use of "personalized physical information" – such as credit cards – to gain access to an event.

In view of this prosecution history, the Court concludes that the claims should not be understood to encompass granting access to an event through the presentation of a credit card or driver's license. Accordingly, the Court will construe the term "personalized physical material" to mean, as Defendant contends, "physical material bearing or containing information specific to an individual ticket holder."

Plaintiff contends that this construction will exclude a preferred embodiment from the scope of the claims, and that such constructions are "rarely, if ever, correct and . . . require highly persuasive evidentiary support . . . ." Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1583 (Fed. Cir. 1996). In the Court's view, the prosecution history discussed above constitutes "highly persuasive evidentiary support." Furthermore, the Federal Circuit has explained that where, as here, both the claim language and prosecution history support a particular claim construction, that claim construction should perhaps nevertheless be adopted even if it excludes a sole embodiment. See Lucent Techs., Inc. v. Gateway, Inc., 525 F.3d 1200, 1216-17 (Fed. Cir.

2008) (based on the claim language and prosecution history,

adopting a construction that excluded the sole embodiment).

**B.    "Paperless Ticket"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| A contract which grants the holder the right to attend an event that is not in tangible form. | An instrumentality used to grant access to an event and that is not embodied in tangible form. |

The specification explains that "[t]he ticket is a contract

which grants the holder the right to attend the event, and

normally, to sit in a particular seat." '809 patent at 1:10-13.

Furthermore, the parties agree that the term "paperless"

indicates that the ticket is not in tangible form.  Accordingly,

the Court will construe the term "paperless ticket" to mean, as

Plaintiff contends, "a contract that is not in tangible form and

that grants the holder the right to attend an event."

11

## C.   "Authentication Data"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Information identifying the user which includes a credit card number, cell phone number, digital encryption on a personal digital assistant, or a single- or multi-dimensional bar code, social security number, phone number, driver's license number, PIN number, or password. | Information that authenticates the bearer as holding a valid ticket. |

With regard to the process of "authentication," Plaintiff notes that the specification explains that it can occur via "infra-red wireless scanning," for example by sliding a credit card through an authentication reader or through the use of bar-coded authentication tickets.[1]   '809 patent at 5:24-30. Plaintiff further notes that the specification explains that "ownership information" can be a "cell phone number, a digital encryption on a personal digital assistant, or a single- or multi-dimensional bar code." Id. at 5:10-20.   From these passages, Plaintiff purportedly draws its proposed construction. However, Plaintiff's proposed construction also refers to items such as a social security number, pin number, password, and driver's license number, which are not mentioned anywhere in the specification.   Without a stronger basis in the internal record,

---

[1] However, as noted above, based on the claim language and prosecution history, the Court excludes this specific embodiment from the scope of the claims.

the Court is highly reluctant to construe "authentication data" in terms of such items. Furthermore, with regard to items that are explicitly mentioned in the specification, the Court concludes that these are mere examples and should not limit the claims. Thus, the Court will not adopt Plaintiff's proposed construction.

For its part, Defendant points to no evidence - either intrinsic or extrinsic - to support its own proposed construction. Thus, the Court is also reluctant to adopt Defendant's proposed construction. To the extent Defendant addresses this claim term at all, it is mainly to criticize Plaintiff's construction. Specifically, Defendant criticizes Plaintiff's proposed construction as improperly seeking to include "two things that are not intangible: a printed bar code and an encrypted personal digital assistant." (Id.) However, Plaintiff clarifies in its Answering Claim Construction Brief that its proposed construction is intended to refer only to "non-physical" information, (see D.I. 60 at 6), a limitation that is nonetheless manifest in the claims (see, e.g., '809 patent at Claim 1). In this regard, the Court notes that Plaintiff's proposed construction does not include a "printed bar code," but merely a "bar code," which the specification confirms is not necessarily physical. See '809 patent at 5:13-15 ("The two dimensional bar code can be printed by the user in order to

provide a physical indication of ticket ownership."). Likewise, Plaintiff's proposed construction does not, as Defendant contends, include "an encrypted personal digital assistant." Rather, it includes a "digital encryption on a personal digital assistant," which again is not necessarily physical in nature. Thus, this particular criticism of Plaintiff's proposed construction is, in the Court's view, unfounded.

Defendant further criticizes Plaintiff's construction as improperly pertaining to the establishment of the "identity of the person providing the data." (D.I. 50 at 28.) However, Plaintiff has agreed that "authentication data has nothing to do with the name or identity of the person who has the account." (D.I. 60 at 5.) Plaintiff further states that "authentication data" is "information indicating a system user or ownership of a ticket." (Id. (emphasis added).) Thus, Plaintiff appears to agree with Defendant that "authentication data" is, at least in part, related to ticket ownership. However, the claims also state that "authentication data" may be associated with both ticket buyers and sellers, neither of which may, at a particular point in time, actually hold a valid ticket. Thus, the Court will not, as Defendant requests, construe this claim term to refer only to the "holding [of] a valid ticket."

Notably, though criticizing Plaintiff's construction, Defendant actually maintains that the parties propose "similar"

14

constructions. (See D.I. 62 at 9.) Thus, the Court understands
Defendant's objections to Plaintiff's proposed construction as
being fairly limited. Accordingly, the Court will construe the
term "authentication data" in a manner largely consistent with
Plaintiff's proposal. Specifically, the Court will construe the
term "authentication data" to mean "information indicating a
system user or ownership of a ticket, such as a credit card
number, a cell phone number, a digital encryption on a personal
digital assistant, or a single- or multi-dimensional bar code."
This construction clarifies the meaning of "authentication data"
without improperly limiting it to examples that are either set
forth in the specification or drawn from some other unknown
source. In addition, in the Court's view, this construction
better expresses the parties' agreement that "authentication
data" does not pertain to the name or identity of the system
user.

## D. "Exchanging"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| To give up something for something else. | Buying or selling in an exchange-type format. |

Defendant contends that this claim term should be limited to
an "exchange-type format," which Defendant explains "is
essentially a market system that, like the New York Stock
Exchange or the Nasdaq, compares offers to buy and sell and

15

completes transactions automatically as soon as a match is found."  (D.I. 50 at 14.)  However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."  See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (quotations omitted).  Thus, where, as here, the specification describes multiple embodiments, the Court is particularly cautious in limiting the claims to a single embodiment, unless such a construction is otherwise dictated by the claim language.  Here, the specification describes, in addition to an "exchange type format," an "auction-type format," a "reverse auction-type format," the sale of tickets for a fixed price, and combinations of these methods.  See '809 patent at 4:1-24, 4:51-62.  In the Court's view, there is nothing about the ordinary word "exchanging" to suggest that it should be limited to only the "exchange-type format."  Accordingly, the Court will construe the term "exchanging" to mean, as Plaintiff contends, "giving up something for something else."

Defendant contends that the term "exchanging" should be limited to an "exchange-type format" because the overall claim is structured in such a way that it can encompass only this format. Specifically, Defendant notes that (1) the claims refer to a

16

"bid," but there is no "bid" in a fixed-price sale, (2) the claims call for "comparing the bid to the asks," but a fixed price sale involves, at most, a comparison with only one ask, and (3) the claims call for completing a sale "when the bid price equals the ask," but auctions are completed at the highest bid price, not when a bid price equals an ask price. (D.I. 57 at 10.) However, the parties have proposed competing constructions for all these claim terms. If, as Defendant contends, these are the actual claim terms that limit the scope of the claims to an "exchange-type format," this contention should be addressed within the context of construing these specific terms. Defendant further contends that the claims are limited to an "exchange-type format" because, in the specification, the claim term "asks" is used only in connection with an "exchange-type format." (See D.I. 50 at 15-16 (citing '809 patent at 4:25-50).) However, this is incorrect: the Summary Of The Invention uses the term "asks" to describe the invention, yet does not explicitly refer to an "exchange-type format." Furthermore, on reviewing the specification, the Court concludes that the mere use of the term "asks" to describe the "exchange-type format" does not amount to either an explicit or implicit definition, nor does it establish "a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel-Flarsheim, 358 F.3d at 906.

17

## E. "Data Center"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| One or more operably connected data structures and computers used for processing or transmitting data. | This claim term is indefinite. |

"If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, [the Federal Circuit has] held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." Exxon Res. & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001). "A claim will be found indefinite only if it 'is insolubly ambiguous, and no narrowing construction can properly be adopted . . . .'" Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir. 2008) (quoting Exxon, 265 F.3d at 1375). Thus, Defendant faces a difficult task in establishing by clear and convincing evidence that a claim term is indefinite.

The specification provides an example of a "data center," explaining that "the data center 2 preferably comprises database servers 10, web servers 12, a load balancing router 14 and a firewall 16 connected to the Internet 8." ('809 patent at 2:40-42.) The specification goes on to describe the functions of each of these components. In particular, the specification explains that (1) the firewall performs functions related to the

18

safeguarding of data, (2) the load balancing router distributes data and tasks, (3) the web server accesses and retrieves information from the database server, and (4) the database server store information regarding venues, events, tickets, ticket status, bidders, etc. (Id.) In the Court's view, Plaintiff's proposed construction comports with this description. Accordingly, the Court will construe the term "data center" to mean, as Plaintiff contends, "[o]ne or more operably connected data structures and computers used for processing or transmitting data."

**F.   "Asks"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| An ask quantity and an ask price. | A plurality of offers to sell tickets, each of which can be accepted. |

The primary dispute between the parties is whether this term is limited to the plural (Defendant's position) or whether it encompasses the singular as well as the plural (Plaintiff's position). Defendant contends that the term is limited to the plural because "[t]he claims and the specification only use the noun 'asks' in the plural form because the term is intended to refer to the asks submitted by a plurality of sellers." (D.I. 50 at 16.) However, this does not appear to be correct. Indeed, Claim 14, which is unasserted, requires a "means for receiving from secondary market event ticket owner electronic asks

19

comprising an ask quantity and an ask price." Likewise, Claim 17, also unasserted, calls for "receiving from the secondary market paperless ticket seller electronic asks comprising an ask quantity and an ask price." Thus, at least two claims associate the term "asks" with only a single "owner" or "seller," undermining Defendant's position that the term "asks" is plural because it is always linked to a plurality of individuals.

"[I]n context, the plural can describe a universe ranging from one to some higher number, rather than requiring more than one item." Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325, 1330 (Fed. Cir. 2004). On reviewing the specification and claims, the Court is unable to identify anything stating that the exchange of tickets in a secondary market requires multiple sellers to collectively provide a plurality of "asks." In other words, the Court finds nothing that strictly precludes use of the invention in connection with a single seller that provides a single "ask." Indeed, the specification even describes the invention with reference to the sale of a single ticket, which is presumably associated with a single seller and a single "ask." See '809 patent at 4:63-5:8 ("During the step of offering the ticket 126, a price is associated with the ticket.") (emphasis added). Thus, the Court concludes that this claim term should encompass the singular as well as the plural. See also Every Penny Counts, Inc. v. Bank of Am. Corp., No. 2:07-cv-42, 2008 U.S. Dist. LEXIS

75672, at *16-*17 (M.D. Fla. Sept. 29, 2008) (construing the term "accounts" to include the singular where nothing in the claim language or specification suggested that it was limited to the plural). Furthermore, the claims specifically state that the "asks [comprise] an ask quantity and an ask price." Accordingly, the Court will construe the term "asks" to mean "one or more asks each of which comprises an ask quantity and an ask price."

G.   "Bid"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| A bid quantity and a bid price. | An offer to buy tickets, including a buyer-proposed price and a quantity. |

The claims explain that "an electronic bid [comprises] a bid quantity and a bid price." See, e.g., '809 patent at Claim 1. However, Defendant contends that adopting this statement as the construction for "bid" is unacceptable because it would allow Plaintiff to capture the exchange of tickets through fixed price sales. (D.I. 50 at 22-23.) Defendant maintains that their proposed construction remedies this by explicitly stating that a "bid" is an "offer to buy." The Court agrees with Defendant that the claims cannot be reasonably understood to encompass the exchange of tickets through fixed price sales. Indeed, the claims specifically include a step in which the bids are compared to the asks. As Defendant notes, in fixed price sales, the buyer simply accepts the price offered by the seller, and there is no

21

process of comparing bids to asks.  (D.I. 50 at 16.)  Based on
the presence of this "comparing" step, the Court is skeptical
that the term "bid" needs additional construction to confirm that
the claims do not encompass fixed price sales.  Nevertheless,
although, as noted above, the specification discloses an
embodiment in which tickets are exchanged through fixed price
sales, the Court agrees with Defendant that the term "bid" is
simply not used in the context of fixed price sales.  Thus, to
remove any uncertainty on this issue, the Court will construe the
term "bid" to encompass the concept of an offer.  Specifically,
the Court will construe the term "bid" to mean, "an offer
comprising a bid quantity and a bid price."

　　　Defendant contends that this claim term should be further
limited to the singular because the claims "(1) say that each bid
is comprised of 'a bid quantity and a bid price;' (2) call for
'comparing the bid to the asks' and; (3) say that 'a transfer' is
completed when 'the bid price equals the ask price and the ask
quantity is equal to or greater than the bid quantity."  (D.I. 50
at 21 (emphasis in original).)  However, the claims recite
receiving "from a ticket buyer an electronic bid."  Id. (emphasis
added).  "That 'a' or 'an' can mean 'one or more' is best
described as a rule, rather than merely as a presumption or even
a convention. . . . The subsequent use of definite articles 'the'
or 'said' in a claim to refer back to the same claim term does

22

not change the general plural rule, but simply reinvokes that non-singular meaning." Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342 (Fed. Cir. 2008). Having reviewed the intrinsic evidence, the Court sees no reason to depart from this rule. Accordingly, the Court will not limit the claim term "bid" to the singular.

H.  "Ask Quantity," "Ask Price," "Bid Quantity," "Bid Price"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|------------|--------------------------|--------------------------|
| "ask quantity" | The number of tickets or tickets being offered for sale or at which a seller or sellers stand ready to sell a ticket. | The number of tickets offered for sale at the ask price. |
| "ask price" | The price selected by the ticket seller or at which a seller or sellers stand ready to sell a ticket. | The price at which an offer to sell tickets can be accepted. |
| "bid quantity" | The number of ticket or tickets a buyer offers to buy from a seller or sellers. | The number of tickets selected by the buyer as part of the bid. |
| "bid price" | The price for a ticket or tickets a buyer offers a seller or sellers. | A price selected by the buyer as part of the bid. |

In general, the parties, particularly Defendant, have proposed constructions for these terms that supposedly reflect a disagreement as to what kinds of ticket exchange formats are

23

covered by the claims. Briefly, Defendant contends that the claims encompass only an "exchange type" format.[2] Plaintiff, on other hand, apparently contends that the claims encompass all sales formats disclosed in the specification, including auction formats, fixed price sales, and "exchange type" formats. On reviewing the parties' briefing, the Court concludes that neither party's position on this issue is correct. Accordingly, the Court also finds neither party's proposed constructions to be satisfactory. In addition, on reviewing the parties' briefing, the Court finds neither party's proposed construction to be particularly well supported by the intrinsic and extrinsic evidence. In these circumstances, the Court will provide additional guidance regarding these claim terms, and direct the parties to meet and confer to attempt to arrive at agreed upon constructions that incorporate the Court's guidance.

With regard to the terms "ask price" and "ask quantity," the parties' dispute appears to focus on whether the claims encompass auctions. Specifically, Defendant objects that Plaintiff's proposed construction for "ask price" refers to the price at which sellers "stand ready to sell a ticket." According to

---

[2] In this regard, as discussed above, Defendant has also proposed a narrow construction for the claim term "exchanging" that reflects this view. However, in rejecting Defendant's proposed construction for "exchanging," the Court noted that Defendant's construction for "exchanging" was largely derivative of their constructions for a number of other claim terms, including the four claim terms discussed in this section.

Defendant, this allows the term "ask price" to cover not just a single price, but a range of prices, and is thus an improper attempt to interpret the claims as covering auctions, events where a seller is willing to sell at any price above a reserve price. Understanding the claims to cover auctions is incorrect, Defendant contends, because the claims "say that each ask has a single ask price," but in auctions there are a range of ask prices. (D.I. 50 at 19 (emphasis in original).) Defendant further contends that the specification uses the term "ask price" only in connection with an "exchange type" sales format, which demonstrates that the term "ask price" - and hence the claims - do not pertain to auctions. On this point, Defendant further notes that the specification explains that "[d]epending on the format the price has a different significance. For example, the price may be a first bid price or, in an exchange type format, the price may be an ask price." ('809 patent at 4:64-66.) Based on this, Defendant contends that the patentee has explicitly defined the term "ask price" as pertaining only to "exchange type" markets. (See D.I. 50 at 18-19.)

The Court is unpersuaded that the terms "ask price" and "ask quantity" limits the claims to only "exchange type" markets. Although, as Defendant notes, the claims explain that an "ask" comprises "an ask price," this does not, in the Court's view, significantly illuminate the nature of what an "ask price" is.

In particular, this does not clarify whether an "ask price" may, for example, be a range of prices that exceed a reserve price, as in an auction. As to this issue, it is noteworthy that both the Abstract and the Summary Of The Invention use the term "ask price" as part of a general description of the "present disclosure" and all its embodiments, which include an auction type format. Furthermore, the Court disagrees with Defendant that the patentee has defined "ask price" as pertaining only to "exchange-type" sales formats. Although the specification explains that "in an exchange type format, the price may be an ask price," this statement is not, in the Court's view, an explicit definition or a clear and unmistakable disavowal of claim scope. Accordingly, the Court concludes that use of the term "ask price" and "ask quantity" do not exclude auctions from the scope of the claims.

With regard to the terms "bid price" and "bid quantity," Defendant provides little, if any, argument directly focusing on these particular terms. Rather, Defendant focuses on the term "bid," which the Court addressed above. There, the Court noted that the term "bid" was not, as Defendant contends, limited to the singular and that it did not refer to fixed price sales. Given this guidance, the parties are instructed to confer regarding the proper constructions, if any, for these four terms.

26

### I. "Comparing The Bid To The Asks"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Examining a bid and ask in order to note similarities and differences. | A bid is compared to all of the submitted asks. |

Defendant objects to Plaintiff's proposed construction as failing to confirm that this claim refers only to the comparison of a single bid and the (plural) submitted asks. (See D.I. 50 at 24-25.) However, as explained above, the Court has declined to construe the claims as being limited to only a single "bid" and more than one "ask." Defendant further objects to Plaintiff's proposed construction as failing to confirm that the "comparing" is done to determine (1) whether the bid price and ask price are "equal" and (2) whether the bid quantity is less than or equal to the ask quantity. Defendant apparently maintains that the claim term should be construed in this manner because the claims explicitly include this requirement. (D.I. 50 at 25.) However, Defendant's own construction fails to include this requirement, and, in light of the claim language, it would be superfluous to include this limitation in the construction of this claim term. Accordingly, consistent with the Court's conclusion that the claims are not limited to plural "asks," the Court will construe the term "comparing the bid to the asks" to mean "examining a bid and one or more asks in order to note similarities and differences."

27

**J.    "Completing A Transfer Of The Paperless Tickets When The Bid Price Equals The Ask Price And The Ask Quantity Is Equal To Or Greater Than The Bid Quantity"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Transfer of the paperless tickets is completed at, during, or after the time that the bid price equals the ask price and the ask quantity is equal to or greater than the bid quantity. | The transfer is completed the moment a bid price equals the ask price and the ask quantity is equal to or greater than the bid quantity. |

The dispute between the parties concerns only the meaning of the term "when" in this claim term. Briefly, Defendant contends that in the context of this claim term, the word "when" is used to explain that ticket transfer is completed instantaneously after the ask price equals the bid price. Defendant's construction for this claim term is almost exclusively dependent upon the Court accepting Defendant's proposal that the claims be limited to "exchange type" sales formats. However, as explained above, the Court declines to limit the claims to "exchange type" formats. The Court will thus not adopt Defendant's proposed construction.

Defendant acknowledges "that 'when' can be either a signifier of causality or proximity in time." (D.I. 57 at 16 (citing Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250-51 (Fed. Cir. 1998).) Likewise, the Federal Circuit has explained that "when" has several meanings and that the particular meaning that prevails depends upon the context.

Renishaw, 158 F.3d at 1250-51. Here, the specification explains
that "exchange type" transactions are distinguishable from
"auction type" formats because, in the former, "sales are made
instantaneously when a bid price equals an ask price for a
ticket." '809 patent at 4:44-50. Thus, the specification
identifies embodiments where transactions are completed the
moment a bid price equals an ask price and embodiments where the
sale is made at some point after the bid price equals the ask
price. In view of this evidence, the Court concludes that the
term "when" should be understood broadly, as Plaintiff contends.
Accordingly, the Court will construe the claim term "completing a
transfer of the paperless tickets when the bid price equals the
ask price and the ask quantity is equal to or greater than the
bid quantity" to mean "transfer of the paperless tickets is
completed at, during, or after the time that the bid price equals
the ask price and the ask quantity is equal to or greater than
the bid quantity."

## K.    "The System"

| Plaintiff's Construction | Defendant's Construction |
| --- | --- |
| An electronic ticketing system for electronically exchanging paperless tickets for an event in a secondary market from ticket sellers to buyers. | As used in Claim 6, this claim term is indefinite. Otherwise, no construction proposed. |

Defendant contends that in Claim 6 the claim term "the
system" is indefinite because it lacks an antecedent basis.

However, "[w]hen the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'" Energizer Holdings v. ITC, 435 F.3d 1366, 1370 (Fed. Cir. 2006). Furthermore, as noted above, in general, Defendant faces a difficult task in establishing by clear and convincing evidence that a claim term is indefinite.

In attempting to make this showing, Defendant notes that the specification appears to disclose multiple embodiments of the ticketing "system" of the invention. For instance, Defendants contend that Figure 1 of the specification discloses a "system" that includes the home computers of ticket buyers, while none of the claims seem to explicitly include this particular component. (D.I. 57 at 18.) In these circumstances, Defendant contends that claim 6 is indefinite because it "gives no indication as to which of these different systems it is supposed to be connected." (D.I. 57 at 19.) Notwithstanding the lack of antecedent basis for the term "system," the Court is unpersuaded that the disclosure of multiple embodiments of the "system" of the invention renders Claim 6 "insolubly ambiguous" such that "no narrowing construction can properly be adopted." Praxair, 543 F.3d at 1319. In this regard, the Court notes that Figure 1 of the specification includes a description of "the system

30

architecture of the preferred embodiment of the present
invention," which includes a data center, venues, and terminals.
'809 patent at 2:29-39. The specification goes on to describe
the makeup and function of these components. See id. at 2:29-
3:50. In its Answering Claim Construction Brief, Plaintiff
explains that the "system" is the "entire set of computers,
databases, and mechanical or optical equipment used to buy and
sell tickets and grant or deny access to sports venues." (D.I.
60 at 38.) In the Court's view, this fairly captures the
descriptions of the "system" set forth in the specification.
Accordingly, the Court will construe the claim term "system" to
mean "the entire set of computers, databases, and mechanical or
optical equipment used for electronically exchanging paperless
tickets for an event in a secondary market from ticket sellers to
buyers."

**L.  "Access To The Venue Upon Presentation Of The Buyer
    Authentication Data To An Access Device"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Access to the venue upon communicating, giving, providing, or making known to the access device the authentication data (e.g., communicating data upon swiping of a magnetic stripe in a magnetic stripe reader). | No construction proposed. |

The parties' dispute over this claim term is merely another
manifestation of the parties' dispute over whether the claims

31

encompass the use of credit cards or drivers' licenses to gain access to an event. For the reasons stated above, the Court has concluded that the claims do not encompass the use of such "personalized physical material" for gaining access to an event. Accordingly, the Court will not adopt Plaintiff's proposed construction for this term. Furthermore, the Court concludes that its construction of the term "personalized physical material" resolves the dispute over this term such that no additional construction is necessary.

## M. Means Plus Function Terms

The parties agree that Claims 1-5 should be construed as means-plus-function terms pursuant to 35 U.S.C. § 112(6). When construing means-plus-function terms, a court must first determine the function that is being performed, "staying true to the claim language and the limitations expressly recited by the claims." Omega Eng'g v. Raytek Corp., 334 F.3d 1314, 1322 (Fed. Cir. 2003). Second, a court must determine what structure, material, or acts provided in the written description correspond to the function performed. Id. A claim governed by § 112(6) does not encompass every structure, material, or act that can possibly perform the specified function. Laitram Corp. v. Rexnord, 939 F.2d 1533, 1535 (Fed. Cir. 1991). Rather, the limitation must be construed to cover the "corresponding structure, material, or acts described in the specification and

equivalents thereof." 35 U.S.C. § 112(6); Odetics, Inc. v.

Storage Tech. Corp., 185 F.3d 1259, 1266-67 (Fed. Cir. 1999).

The claim limitation covers only the structure, material, or acts

necessary to perform the function. Omega Eng'g, 334 F.3d at

1322.

**1. "Means For Associating The Paperless Tickets With Authentication Data Of The Ticket Seller"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function**: Associating the paperless tickets with authentication data of the ticket seller. | This claim term is indefinite. |
| **Structure**: A manifestation of logic such as software (for example, and not limited to, a programming language) or a data structure (for example, and not limited to, a database server, a database, a data table, a data record, or a data field). | |

Binding Federal Circuit precedent dictates that Plaintiff's

proposed structure is inadequate. In Aristocrat Techs. Austl.

PTY Ltd. v. Int'l Game Tech., 521 F.3d 1328 (Fed. Cir. 2008), the

patent-in-suit pertained to a method of making slot machines more

exciting by allowing players to define winning opportunities.

Aristocrat, 521 F.3d at 1330. The patent claim at issue recited

a "game control means" for performing three functions related to

carrying out the invention. Id. at 1331. Similar to Plaintiff

in this case, the plaintiff in Aristocrat argued that the

33

corresponding structure was "a standard microprocessor-based gaming machine with 'appropriate programming.'" Id. In finding the claims indefinite, the Federal Circuit explained that "[i]n cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, [it] has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." Id. at 1333. Because "general purpose computers can be programmed to perform very different tasks in very different ways," the Federal Circuit explained, "simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." Id.

Here, the Plaintiff has not even proposed that the corresponding structure be something as tangible as a "general purpose computer." Rather, the Plaintiff has asserted even more vaguely that the corresponding structure is a "manifestation of logic." But the Federal Circuit explained in Aristocrat that a "reference to 'appropriate programming' imposes no limitation whatsoever, as any general purpose computer must be programmed." Id. at 1334. Likewise, in Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1340-41 (Fed. Cir. 2008), the Federal Circuit explained that "[s]imply reciting 'software' without providing

34

some detail about the means to accomplish the function is not enough." Furthermore, a "means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function." Net Moneyin, Inc. v. Verisign, Inc., 545 F.3d 1359, 1367 (Fed. Cir. 2008). Thus, Plaintiff's proposed corresponding structure for this claim term - a "manifestation of logic" - is indefinite.

In fact, during the Markman hearing, Plaintiff acknowledged a potential problem with this structure:

> Now, you know, being perhaps self-critical; in reading our position last night, we have said that the definition of these means-plus functions should be a manifestation of logic, including software or a database.
>
> That may be perhaps too fuzzy a term. And what the real core here is, is that the structure that would perform the associating, reassociating, is principally a database, a database that can have software in it, such as the JAVA software indicated. It could also be done by JAVA itself.
>
> So, when we're talking about structure, the phrase a manifestation of logic, perhaps that is too broad of a phrase, but what we're really focusing on is databases.
>
> Databases in a Web server are the structure of E-Commerce and that's what's disclosed in this patent.

(D.I. 72 at 37:2-19.)

Given these remarks, the Court has undertaken a review of the specification and extrinsic evidence to determine whether "Databases in a Web server," or something similar, could serve as the corresponding structure for this claim term. In particular,

the Court has endeavored to conduct the "proper inquiry for purposes of section 112 paragraph 6," which is to "'look at the disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software [to perform the function] and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program.'" <u>Aristocrat</u>, 521 F.3d at 1338 (quoting <u>Medical Instrumentation & Diagnostics Corp. v. Elekta AB</u>, 344 F.3d 1205, 1212 (Fed. Cir. 2003)).

Having done so, the Court notes the following. First, the specification explains that the "database servers" "store data tables which contain information about various venues, events, ticket resources, user roles, ticket status, ticket holders and ticket bidders . . . ." '809 patent at 2:62-65. Referring to "ticket status" and "ticket holders," this statement links the "database server" to the claimed function of associating tickets with seller authentication data. The specification further explains that the "database server is preferably a computer running UNIX, Windows NT, Java or Sparc and having an Oracle, Informix, Sysbase or SQL Server database." <u>Id.</u> at 3:25-29. With regard to this disclosure, Plaintiff's expert, Dr. Steven R. Kursh, opines that this is standard technology that was well-known at the time of the invention and that SQL server databases, in particular, are databases that utilize a Structured Query

Language.  (D.I. 49 at ¶¶ 14-16.)  Dr. Kursh further opined that
the "functions of associating and reassociating user data with
paperless tickets can be performed using standard procedures and
publicly available well-known software and databases, such as the
example software and databases disclosed in the '809
specification at col. 3, lines 27-29" (i.e., Oracle, Informix,
Sysbase or SQL Server databases).  (D.I. 65 ¶ 38.)

    In the Court's view, this testimony, if accepted, confirms
only that the specification discloses software tools that can be
used to implement algorithms that carry out the claimed
functions.  Dr. Kursh fails to identify any actual algorithm for
carrying out the claimed functions.  In this regard, Defendant's
expert, Dr. V. Thomas Rhyne, opines that "none of [Oracle,
Informix and Sybase] come preprogrammed to carry out the
functions called for in the means-plus-function limitations of
claim 1."  (D.I. 58 ¶ 28).  As to SQL, Dr. Rhyne opines that it
includes "no specific mechanism . . . to accomplish the functions
called out . . . ."  (Id. ¶ 29.)  Thus, although it is a close
question, the Court concludes that one of skill in the art would
not understand the disclosure as encompassing algorithms for
performing the function of this claim limitation.  See
Aristocrat, 521 F.3d at 1338 (where the "patent does not disclose
the required algorithm or algorithms, and a person of ordinary
skill in the art would not recognize the patent as disclosing any

37

algorithm at all," a means-plus-function limitation in a computer-implemented invention was indefinite).

Accordingly, the Court concludes that the means-plus-function term "means for associating the paperless tickets with authentication data of the ticket seller" has as its function "associating the paperless tickets with authentication data of the ticket seller." The specification does not set forth corresponding structure.

**2.  "Means For Reassociating The Paperless Tickets With Authentication Data Of The Ticket Buyer"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function:** Reassociating the paperless tickets with authentication data of the ticket buyer. | This claim term is indefinite. |
| **Structure:** A manifestation of logic such as software (for example, and not limited to, a programming language) or a data structure (for example, and not limited to, a database server, a database, a data table, a data record, or a data field) | |

This claim term is similar to the claim term "means for associating the paperless tickets with authentication data of the ticket seller," which is discussed immediately above. The only difference is that this claim term recites "reassociating" with a "buyer," whereas the claim term discussed immediately above recites "associating" with a "seller." Accordingly, the Court

38

concludes that the means-plus-function term "means for reassociating the paperless tickets with authentication data of the ticket buyer" has as its function "reassociating the paperless tickets with authentication data of the ticket buyer." The specification does not set forth corresponding structure.

### 3. "Means For Receiving From Ticket Sellers Electronic Asks"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function:** Receiving from ticket sellers electronic asks. | **Structure:** A firewall, load balancing router, and web server. |
| **Structure:** A manifestation of logic such as software (for example, and not limited to, a programming language) or a data structure (for example, and not limited to, a database server, a database, a data table, a data record, or a data field). | |

Although Defendant does not explicitly provide a function for this means-plus-function term, it does not appear to dispute Plaintiff's proposed function, which is apparent from the claims. For the reasons stated above, Plaintiff's proposed function — a "manifestation of logic" — is not acceptable.

As Defendant notes, the specification explains that the "data center" of the invention includes a "firewall" that "receives messages from the Internet," a "load balancing router" that forwards messages from the "firewall," and a "web server"

that stores and receives messages from terminals. '809 patent at
2:40-65. However, the specification further explains that the
"firewall" conducts filtering and network address translation
functions for the purpose of safeguarding data from unauthorized
access, and that it may also perform encryption. '809 patent at
2:46-51. In this regard, on reviewing the specification, the
Court concludes that "firewall" is not necessary to perform the
recited function, which is to merely receive electronic asks from
sellers. Accordingly, the Court will not include the "firewall"
in the corresponding structure for this claim term. See Omega
Eng'g, 334 F.3d at 1322 ("[T]he structure must be necessary to
perform the claimed function."). Likewise, the "load balancing
router" is described as "distribut[ing] processing demands," and
also does not appear to be necessary for the performance of the
claimed function. Id. at 2:55-60. Thus, the only component that
appears to be necessary for performing the claimed function is
the "web server." Accordingly, the Court concludes that the
means-plus-function term "means for receiving from ticket sellers
electronic asks" has as its function "receiving from ticket
sellers electronic asks." The corresponding structure is "a web
server and equivalents thereof."

### 4. "Means For Receiving From A Ticket Buyer An Electronic Bid"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function:** Receiving from ticket buyer an electronic bid. | **Structure:** A firewall, load balancing router, and web server. |
| **Structure:** A manifestation of logic such as software (for example, and not limited to, a programming language) or a data structure (for example, and not limited to, a database server, a database, a data table, a data record, or a data field). | |

The parties agree that this term should be treated the same as the claim term "means for receiving from ticket sellers electronic asks." Accordingly, the Court concludes that the means-plus-function term "means for receiving from a ticket buyer an electronic bid" has as its function "receiving from a ticket buyer an electronic bid." The corresponding structure is "a web server and equivalents thereof."

41

5.    "Means For Granting Access To The Event Upon
      Presentation Of The Buyer Authentication Data Of
      The Paperless Ticket"

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function:** Granting access to the event upon presentation of the buyer authentication data of the paperless ticket.<br><br>**Structure:** A turnstile, display, or signal. | **Structure:** A turnstile (which includes a printer, display, authentication reader, processor and network connection) and venue database server connected via a network as shown in Figure 3, and programmed to perform the algorithm shown in Figure 5. |

Although Defendant does not explicitly provide a function
for this means-plus-function term, it does not appear to dispute
Plaintiff's proposed function, which is apparent from the claims.

The parties dispute whether the specification discloses a
series of alternative structures for "granting access"
(Plaintiff's position) or if it just discloses one structure with
multiple components (Defendant's position). On reviewing the
specification, the Court agrees with Defendant that only one
structure (a "turnstile") is disclosed for granting access to
events. However, as explained below, the Court also concludes
that Defendant has included within its proposed structure a
number of components that are not necessary for performance of
the claimed function.

In describing the "venues" that are used in connection with
the invention, the specification explains that they each have a
plurality of "turnstiles," each of which "comprises an

42

authentication reader 24, a printer 26, a network connection 28, a display 29, and a processor 31." '809 patent at 3:2-5. Thus, the specification explains that the "display" is a component of the "turnstile" and not, as Plaintiff contends, a separate means for "granting access." Furthermore, the Court has reviewed the specification, and finds no instance where either a "signal" or a "display" is otherwise characterized as a separate means for granting access to an event. Rather, these things are always characterized as components of a "turnstile," which is the only structure set forth in the specification for "granting access."

The only remaining issue is whether all of the components of the "turnstile" are necessary for the claimed function of "granting access." The Court notes that the specification describes the "printer" as being only for the purpose of preparing a receipt, which, in the Court's view, is not necessary for the function of "granting access." Furthermore, the Court disagrees with Defendant that the corresponding structure must include a reference to Figure 3 of the specification, which refers to components like the "firewall" and "Internet" that are also not necessary for the "granting access" function. With these exceptions, all other components of the turnstile are described as being integral to the process of "granting access." For instance, the "network connection" is described as being necessary for the "turnstile" to communicate with the "database

43

server," which maintains information regarding ticket holders, venues, etc. Likewise, the "display" is described as being necessary to indicate either the failure or success of the authentication process. Furthermore, Figure 5, though including steps pertaining to the printout of a receipt, sets forth the overall algorithm for the "granting access" step. Accordingly, the Court concludes that the means-plus-function term "means for granting access to the event upon presentation of the buyer authentication data of the paperless ticket" has as its function "granting access to the event upon presentation of the buyer authentication data of the paperless ticket." The corresponding structure is "a turnstile (including a display, authentication reader, processor and network connection) and venue database server connected via a network and programmed to perform the algorithm shown in Figure 5, not including steps 220 and 226 pertaining to the generating of a receipt."

**6.   "Means For Comparing The Bid To The Asks"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function:** Comparing the bid to the asks.<br><br>**Structure:** A manifestation of logic such as software (for example, and not limited to, a programming language) or a data structure (for example, and not limited to, a database server, a database, a data table, a data record, or a data field). | This claim term is indefinite. |

For the reasons stated above, Plaintiff's proposed structure is inadequate. Furthermore, on reviewing the specification, the Court is unable to identify structure that corresponds to the function of "comparing the bid to the asks." In particular, the Court is unable to conclude that the particular database software listed in the specification qualifies as corresponding structure for this limitation. On this issue, Plaintiff's expert, Dr. Kursh, opines that "comparing bids and transfers and completing a transfer of the paperless tickets would have been understood at the time of the invention to be standard functions which would be performed using logic manifestations, including standard software and databases." (D.I. 65 ¶ 38.)  Dr. Kursh further opines that "[o]ne of skill in the art reading the '809 patent could write computer program(s) using the technologies that are described in the '809 patent." (Id. ¶ 39.)  However, there are two problems

with this argument. First and foremost, Dr. Kursh's argument "conflates the definiteness requirement of section 112, paragraphs 2 and 6, and the enablement requirement of section 112, paragraph 1. The fact that an ordinarily skilled artisan might be able to design a program [to compare bids to asks] goes to enablement." Blackboard, Inc. v. Desire2Learn, Inc., No. 2008-1548, slip op. at 24 (Fed. Cir. July 27, 2009). As the Federal Circuit explained, "a means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function." Net Moneyin, Inc., 545 F.3d at 1367. Here, the details of the "comparing" step may vary greatly depending on whether tickets are exchanged in a secondary market through an auction, reverse-auction, or exchange-type format. Likewise, the details of the "comparing" step may vary depending on the number of sellers and buyers involved. Although database software is disclosed that could perhaps be used to implement the various algorithms for carrying out the "comparing" step in these different environments, no such algorithm is actually provided – or even suggested – for carrying out the "comparing" step in a single one of these environments. This shortcoming renders this claim term indefinite.

Second, although the patent discloses standard software and databases, such as Oracle and Informix, the specification does

not clearly link the "database server" to the "comparing" step. Indeed, the "comparing" step is carried out in connection with the exchange of tickets in the secondary market, and there is no mention of the "database server" in the sections of the patent that discusses this issue. See '809 patent at 3:65-5:20. Rather, the "database server" is discussed in connection with the processes of tracking ticket ownership and granting access to venues. See id. at 2:40-3:28, 5:21-40.

Accordingly, the Court concludes that the means-plus-function term "means for comparing the bid to the asks" has as its function "comparing the bid to the asks." The specification does not set forth corresponding structure.

**7.** **"Means For Completing A Transfer Of The Paperless Tickets When The Bid Price Equals The Ask Price And The Ask Quantity Is Equal To Or Greater Than The Bid Quantity"**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| **Function:** Completing a transfer of the paperless tickets when the bid price equals the ask price and the ask quantity is equal to or greater than the bid quantity. | This claim term is indefinite. |
| **Structure:** A manifestation of logic such as software (for example, and not limited to, a programming language) or a data structure (for example, and not limited to a database server, a database, a data table, a data record, or a data field). | |

For the reasons stated above, Plaintiff's proposed structure is inadequate. The specification explains that "[t]he venue database server 20 maintains a record of the tickets [that] have been sold, the ticketholders [that] have passed through the turnstile 18 and which ticketholders have not yet arrived." '809 patent at 3:24-26. The specification further explains that "[e]ach time a ticket is transferred new ownership information is associated with the ticket," and that this "ownership information" could be, for example, a credit card or cell phone number. Id. at 5:8-20. Thus, the specification explains that the "database server" keeps track of ticket ownership, and that ticket transfer is accomplished through the "association" of

48

ownership information. In this regard, the specification appears to link the "database server" to the function of completing ticket transfers. However, as above, the mere disclosure of a "database server" and associated software merely discloses tools that could be used to implement the function of this claim limitation. The specification does not otherwise disclose an actual algorithm for carrying out the function of this limitation.

Accordingly, the Court concludes that the means-plus-function term "means for completing a transfer of the paperless tickets when the bid price equals the ask price and the ask quantity is equal to or greater than the bid quantity" has as its function "completing a transfer of the paperless tickets when the bid price equals the ask price and the ask quantity is equal to or greater than the bid quantity." The specification does not set forth corresponding structure.

## CONCLUSION

For the reasons discussed, the Court has construed the disputed terms and/or phrases of the patent-in-suit as provided herein. An Order consistent with this Memorandum Opinion will be entered setting forth the meanings of the disputed terms and/or phrases in the patents-in-suit.